STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-02-36

JLH- PEN- 10/14 2003

FILED & ENTERED
SUPERIOR COURT

OCT 1 4 2003

PENOBSCOT COUNTY

Peregrine Developers,
    Appellant

v.

Order on Appeal

Town of Orono,
    Appellee

and

DONALD L. GARBRECHT
LAW LIBRARY

OCT 31 2003

Lambros Karris et al.,
    Intervenors

Pursuant to M.R.Civ.P. 80B, 30-A M.R.S.A. § 2691(3)(G) and TOWN OF ORONO, MAINE LAND USE ORDINANCE § 18-83(a)(1) (Ordinance), Peregrine Developers appeals from separate decisions of the Town of Orono Zoning Board of Appeals (ZBA) and the Town of Orono Planning Board (the Board), denying its applications for approval of a planned unit development, site plan and subdivision. Each of these applications is associated with Peregrine's proposal to construct a two-building residential facility in Orono. On this appeal, Peregrine argues primarily that the ZBA and the Board erred in concluding that the facility constitutes a dormitory and, on that basis, that the proposed

1

development falls outside of the scope of permissible uses established by the Town's ordinances. The court has considered the parties' written submissions on this appeal.[1]

In June 2002, Peregrine filed an application with the Town's Board for approval of a proposed subdivision, an accompanying site plan and a planned unit development. R. 56. The development would consist of two, three-story residential buildings to be located on a parcel of just more than 20 acres in size. *Id.* at p. 1 of 16, 4 of 16. The two buildings would contain 84 and 69 dwelling units respectively, for a total of 153. *Id.* at p. 4 of 16. Each such unit was designed to have one, two or four bedrooms. *Id.* The two buildings would contain a total of 494 bedrooms. *Id.* Each unit would also contain a kitchen, bathroom and common area. Peregrine initially planned to issue separate leases to each resident; the parent of a student tenant also would be included as a signatory. R. 53, pp. 88-89. However, when (as is noted below) Peregrine lost any affiliation with the University itself, it changed the lease structure so that a single unit (rather than a single bed) would be the subject of the lease.[2] *Id.*

The building plans reveal that access to the individual units would be through interior hallways. R. 46. Two parking lots would service the facility, with spaces for 479 vehicles – almost identical to the number of bedrooms in the complex. R. 46, tab C; R. 50. The residents' mail would be delivered to a central mailbox kiosk. R. 32, p. 1; R. 46, page 1 of 16. Two common recreation areas were planned to be located in the buildings' courtyards. R. 32, p. 2. One of the activities that Peregrine planned for the recreational areas is volleyball. R. 32, p. 2. Full-time security personnel as well as "community assistants" would either live on premises or maintain a presence there. R. 32, pp. 5 and 12 (unnumbered).

This development was originated with the involvement of the University of Maine. R. 49. Peregrine's marketing studies were based on enrollment data for the University. R. 32, p. 12. Subsequently, however, the University withdrew from the

---

[1] The evidence noted in the next portion of this order was part of the record presented to the ZBA, either as part of the record developed before the Planning Board and then submitted to and reviewed by the ZBA, or presented to the ZBA in the first instance.

[2] The intervenors' factual assertion that Peregrine intended to require individual tenants to execute leases, rather than to obtain one lease agreement for each unit, does not appear to be supported by the record.

2

project and in fact, for reasons stated in writing, instructed Peregrine not to convey any impressions that the University bore some connection to it. R. 48. Peregrine nonetheless continued to emphasize a central purpose of the housing development as one directed to University students. *See, e.g.,* R. 15, p. 3 (unnumbered) (Peregrine's application for a safety permit identified the development as a "student housing complex"); R. 17, p.1 (the traffic study prepared for and submitted by Peregrine described it as a "commercial dormitory"); R. 49, p. 1 (unnumbered) (Peregrine describes the development as a "privatized off-campus student housing project"); R. 50 (Peregrine's application to the Department of Environmental Protection refers to the development as "A Student Housing Project"). Peregrine hoped to establish a transportation system connecting the buildings to the University campus. R. 50 p. 2 (unnumbered). Additionally, Peregrine's presentation to the municipal boards pointed to its focus on the student housing market. *See, e.g.,* R. 30, p. 7 (representative of Peregrine's architect advised Board that "you would have to be a student" to acquire housing at the project). It also noted to the Planning Board that the traffic studies were based on both dormitory and apartment models. R. 32, p. 4. However, despite the importance of the students as residents, the housing project would be available to others, such as local residents, including families. R. 46, pp. 11 of 16, 16 of 16.

The development site is located within the Town's Forestry and Agriculture District (F&A). The municipal ordinance describes that district's underlying concept in the following way:

> The Forestry and Agricultural District (F&A) is limited to agriculture, forestry and certain other nonintensive uses. Low density residential and related uses are permitted as consistent with the Comprehensive Plan. The purpose of the district is to primarily prevent premature development of land where there are basically no public water and sewer utilities, and where the extension to such facilities is not feasible, to retain certain areas for nonintensive uses, to prevent development where it would be a burden on the Town, and to retain areas for open space, such as natural water bodies and land suitable for support of natural plant cover, or land designed for recreational use.

Ordinance, § 18-105(e), R. 57. Because the number of dwelling units would exceed the basic density restrictions imposed on residential structures in the F&A district, Peregrine submitted applications for a planned unit development (PUD) as well as for site plan

3

review and subdivision approval. The parties here do not dispute that the proposed development is within the quantitative density criterion under the F&A regulations, as adjusted by the PUD provisions. Acceptable uses within the F&A district include multi-family dwelling, if it is part of a PUD. Ordinance, § 18-106(e) and footnote 5.

In its permit applications, Peregrine framed its proposed development as a multi-family dwelling. *See, e.g.,* R. 46, p. 1 (unnumbered). Although the ordinance does not include a definition of the specific term "multi-family dwelling," the parties to this action sensibly have drawn on and rely on the ordinance's definition of "dwelling, multifamily:" ". . .a residential building designed for or occupied by three of more families, with the number of families in residence not exceeding the number of dwelling units provided." Ordinance, § 18-31. A "family," in turn, is defined alternatively:

(1) One or more legally related persons occupying a single dwelling; or

(2) A group of unrelated individuals, not to exceed five persons, occupying a single dwelling unit; such group to be distinguished from a group occupying a communal living facility, *dormitory*, group home, hotel, rooming house or social, fraternal organization.

*Id.* (emphasis added).

After several public hearings held in 2002, the Board decided by a vote of 4-3 to deny Peregrine's permit and development applications on the ground that the proposal was not a permitted use within the F&A District. R. 29; R. 36. Under the Town's ordinances, an appeal from the denial of site plan applications and subdivision approval applications lies with the Superior Court. Ordinance, § 18-83(1)(a). In accordance with that provision, Peregrine filed a rule 80B appeal to this court. Contemporaneously, as it was required to do under the controlling ordinance, *id.*, Peregrine filed an appeal from the Board's denial of its PUD application to the ZBA. The ZBA considered that appeal at a public hearing and meeting held on February 26, 2003. The parties agree that this was a *de novo* hearing. The ZBA concluded that the residential facility that Peregrine sought to build was a dormitory. Consequently, its occupants are not "family" members, and the buildings therefore are not multi-family residences. Seen in this light, the development would not therefore not permitted in the F&A district. On that basis, the ZBA upheld the Board's denial of Peregrine's PUD application. R. 53, p. 100 (transcript); R. 52 (written

4

findings and conclusions). Peregrine's appeal from the ZBA's determination has been merged and consolidated in this proceeding.

Although Peregrine here challenges two separate decisions made by separate municipal bodies, those decisions rest on the identical construction of the relevant ordinances. Further, because the ZBA conducted a *de novo* hearing on the issues raised by Peregrine's appeal from the Planning Board's adverse decisions, this court reviews the former rather than the latter. *See Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 4, 757 A.2d 773, 775. The parties have analyzed the dispositive issues on this appeal in this way,[3] and thus the two levels of municipal proceedings need not be distinguished here.

Peregrine contends on this appeal that the ZBA erred in concluding that its proposed development would constitute a "dormitory" and thus that the residential structures are not multi-family dwellings, which would be the only applicable permissible use in the F&A district. It also argues that the ZBA's conclusion is flawed because it failed to consider both alternative formulation of "family" as set out in the ordinance.

## A. "Dormitory"

Peregrine applied for approval of its proposed development on the predicate that the buildings were "multi-family dwellings." This would be true only if the buildings were designed for or occupied by "families." Under the terms of the ordinance, occupants of dormitories are not "families." Peregrine thus takes the position that the proposed housing project is not a pair of dormitories.

In part, a "multi-family dwelling" is a residential facility that is "designed for or occupied by three or more families. . . ." Under the ordinance, one of the two definitions of a "family" is "a group of unrelated individuals, not to exceed five persons, occupying a single dwelling unit. . . ." However, the same provision excludes "a group occupying a. . .dormitory" from that affirmative definition of a "family." Therefore, if Peregrine's proposed project, even in part, is designed for or occupied by a group of unrelated individuals in a dormitory setting, then the project will have crossed over from a

---

[3] Peregrine has argued that the Planning Board's decision was tainted by the bias of two Board members. However, because the substantive issues of legislative construction are identical in its challenges to the decisions made by the Planning Board and by the Zoning Board of Appeals, the court need not reach Peregrine's challenge to the Planning Board's process.

permissible use of multi-family dwelling into a use that is foreclosed by the Town's land use ordinance. Here, the ZBA did not deny Peregrine's application due to any failure of the project to satisfy the initial elements of a "family" in that part of the definition invoked by the body. Rather, the ZBA concluded that the project fell into the exclusion to the definition of "family" because it was a dormitory. Therefore, the question presented on this appeal is whether the ZBA erred in reaching the conclusion that the development, at least in part, would constitute a dormitory.

The word "dormitory" is not defined in the Town's land use ordinance. The ordinance does provide, however, that in the absence of a definition within the body of the legislation, those undefined "words and terms. . .shall have their customary dictionary meanings." Ordinance, § 18-31. *See also George D. Ballard, Builder, Inc. v. City of Westbrook*, 502 A.2d 476, 480 (Me. 1985) ("Undefined terms should be given their common and generally accepted meaning unless the context clearly indicates otherwise."). In fact, the record on appeal includes four definitions of the word "dormitory" taken from various dictionaries. *See* R. 43-45. Included among those definitions are the following: "A building for housing a number of persons, as at a school or resort" (R. 43; R. 45); "a sleeping apartment capable of containing many beds, esp., one connected with a college or boarding school" (R. 45). Although the sources used by the ZBA offer other definitions, the body was entitled to consider these.

Peregrine's arguments on appeal implicate two standards of review. First, it claims that the ZBA erred as a matter of law by considering these dictionary definitions of "dormitory." This issue implicates the construction of the ordinance. "The meaning of terms or expressions in a zoning ordinance is a question of law for the court. . . . " *George D. Ballard, Builder*, 502 A.2d at 480. "The terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole.'" *Banks v. Maine RSA # 1*, 1998 ME 272, ¶ 4, 721 A.2d 655 (citation and internal punctuation omitted).

Second, Peregrine argues that the ZBA was incorrect in its factual conclusion that its proposed buildings are a "dormitory." Such factual findings are reviewed to determine if they are supported by substantial evidence in the record. *Kurlanski v. Portland Yacht Club*, 2001 ME 147, ¶ 7, 782 A.2d 783, 784; *Penobscot Area Housing*

*Development Corp.*, 434 A.2d 14, 22-23 (Me. 1981) (Law Court reviews administrative record for evidence in support of conclusion that prospective residents were not a "family"). Peregrine must demonstrate that on the hearing record, the ZBA was compelled to reach a contrary conclusion. *Veilleux v. City of Augusta*, 684 A.2d 413, 415 (Me. 1996). That other reasonable conclusions were available to the ZBA does not mean by itself that this decision is unsupported by the record. *Id.*

With respect to the ZBA's construction of the word "dormitory," Peregrine argues that as a result of its definitional breadth, it was improper for the ZBA to use any dictionary definition. In two ways, this approach would violate the fundamental precept of statutory construction that "[w]ords must be given meaning and not treated as meaningless and superfluous." *Stromberg-Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 9, 765 A.2d 566, 569. First, Peregrine's argument would write out the word "dormitory" from the definition of "family." Second, it would also render meaningless the ordinance's own express rule of construction that words otherwise undefined must be given their common meaning.

Peregrine also argues that if the common, dictionary definitions are extended to the word "dormitory' as it appears in the ordinance's definition of "family," then there could be no such things as a permissible "multi-family dwelling," because any such structure necessarily would be a dormitory and thus not allowed in the F&A district. This conclusion, however, overlooks the qualitative and quantitative differences between the project envisioned by Peregrine and other types of residential facilities that Peregrine foresees will be swallowed up the construction imposed by the ZBA. The dictionary definitions of "dormitory" noted above and used by the ZBA are predicated on a close relationship between the residential facility and a school. The evidence presented to the ZBA demonstrates that there are instances (including the one at bar) where a residential development has particularly close ties to an educational institution. This alone distinguishes projects of the type proposed by Peregrine from other apartment buildings or residences that happen to be located near a school. Further, the magnitude of the buildings designed by or on behalf of Peregrine is much more suggestive of common notions of a "dormitory" than of other housing facilities. These are examples of varying

7

qualities and features that support the conclusion that the definitional scope of the "dormitory" exclusion is not so great as to vitiate the universe of permitted buildings.

This construction is also fully consistent with the basic purpose that the Town has attempted to promote by creating the F&A district. In the ordinance, the Town articulated a goal of limiting development in that area. Here, the parties who are adverse to Peregrine do not argue that the proposed development exceeds the applicable quantitative density standards. Nonetheless, when engaging in the exercise of construing the nature of a "dormitory" as that term in used in the ordinance, it is useful to bear in mind the implication, raised by the dictionary definitions, that a dormitory is a large-scale housing facility. *See, e.g.,* R. 43 (". . .housing a number of persons. . ."). The dictionary definitions do not specify the "number," but they can fairly be read to suggest that buildings designed for a substantial number of occupants is more akin to a "dormitory" than ones that can only accommodate a smaller number of residents. Large-scale development is not permitted in the F&A district, and typically large-scale projects such as dormitories are thus foreclosed.

For these reasons, the court concludes as a matter of law that the ZBA did not err in its construction of the word "dormitory."

Further, the record presented to the ZBA did not compel it to conclude, as a factual matter, that Peregrine's proposed buildings were not dormitories. Although Peregrine did not limit its potential clientele to students, the ZBA was entitled to find that the project was principally aimed to create student housing. Peregrine and those it retained to develop aspects of the project characterized it that way. Until the University divorced itself from the development plans, the University worked closely with Peregrine. Notably, the studies underlying the project were based on data limited to University housing and other related issues.

Further, the housing project has many of the hallmarks of a dormitory. As is noted above, it is geared largely – although not exclusively – to the student housing market. The buildings would accommodate a large number of tenants, including many students. There would likely be direct transportation connections to the University campus. Although many components of the residential units would be self-contained, other service – such as mail delivery – would be in common areas. That the residential

8

units would have their own kitchens does not by itself defeat the notion that the buildings could not be a dormitory complex. Rather, this layout is not inconsistent with dormitory living, because the separate units can be seen as suites within a larger dormitory setting. The presence of "community assistants" has an aura of resident assistants who often live in on-campus dormitory buildings. Even if there are imaginable circumstances where the definitional parameters of a "dormitory" were unclear, this is not such a case.

These and other factual points presented to the ZBA constituted a record that allowed it to conclude, as it did, that Peregrine's development would amount to a dormitory.

### B. "Family"

Peregrine also argues on this appeal that the ZBA erred by considering only one prong of the alternative definitions of "family" set out in the ordinance. The other prong, on which Peregrine correctly argues the ZBA did not rely, defines "family" as "one or more legally related persons occupying a single dwelling;. . . ." Ordinance, § 18-31. Thus, for example, a married couple is a "family" if they reside in a single residential unit.[4] From Peregrine's perspective, the important point is that this definition of family is not subject to the dormitory exclusion that limits the universe of people who may constitute a "family" under the second definition. Thus, a residential facility designed for or occupied by groups of legally related tenants is a multi-family dwelling, even if it is a dormitory.

Peregrine's project, however, is intended to serve groups of students and other legally unrelated persons as well as groups of "legally related persons." Because the project at issue here is "designed for" both types of "family," Peregrine must demonstrate that the housing is allowable for both. Because the proposed facility is designed in significant part to serve as the residence of groups of persons who are not a "family," then that by itself defeats Peregrine's argument that the development can only be regarded as a multifamily dwelling. The ZBA's silence on the first definition of "family" is consequently immaterial.

---

[4] This conclusion, however, is subject to the Town's argument that because the married couple must live in a "single dwelling" in order to satisfy this alternative definition of a "family," Peregrine's multiple unit facility could not be deemed to house such a "family." The court need not and does not reach this argument.

The entry shall be:

For the foregoing reasons, the court affirms the decisions of the Town of Orono's Planning Board and Zoning Board of Appeals denying Peregrine's permit applications.

Dated: October 13, 2003

_____
Justice, Maine Superior Court

Date Filed __12/13/02__    __PENOBSCOT__    Docket No. __AP-2002-36__
                              County         Count IV Dismissed- USDC 2/3/03

Action __80B APPEAL__

   **ASSIGNED TO JUSTICE JEFFREY L. HJELM**


                    **intervenors** –  LAMBROS KARRIS and SARAH TRASK


| PEREGRINE DEVELOPERS | vs. | TOWN OF ORONO |

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| RUDMAN & WINCHELL, LLC<br>P O BOX 1401<br>BANGOR, ME.  04402-1401<br>BY:  EDMOND J. BEAROR, ESQ.<br>     TIMOTHY A. PEASE, ESQ. | EATON PEABODY<br>P O BOX 1210<br>BANGOR, ME.  04402-1210<br>BY:  WILLIAM B. DEVOE, ESQ.<br>     P ANDREW HAMILTON, ESQ. Co-Counsel<br>FOR: TOWN OF ORONO |
| ROY, BEARDSLEY, WILLIAMS & GRANGER<br>6 Water St - P O Box 723<br>Ellsworth ME  04605-0723 | |

| Date of<br>Entry | BY: Daniel A Pileggi Esq.<br>FOR:  Lambros Karis, Intervenor<br>and   Sarah Trask, Intervenor |
|---|---|
| 12/13/02 | Complaint for Governmental Action (M.R.Civ.P. 80B) With Claim for Independent Relief From Governmental Action filed.  (Exhibit A attached) |
| 12/18/02 | Notice and Briefing Schedule 80B Appeal of Governmental Actions filed. Copy forwarded to Plaintiff's Attorneys and to Town of Orono. |
| 12/18/02 | Officer's Return of Service as to Town of Orono.  (S.D. 12/13/02) (By: Wanda Thomas, Town Clerk) |
| 12/24/02 | Plaintiff's Motion to Stay Count III of its 80B Appeal filed. |
| 12/24/02 | Plaintiff's Motion for Order Specifying Future Course of Proceedings filed. |
| 12/27/02 | File presented to Justice Hjelm for review. |
| 12/27/02 | File returned by Justice Hjelm, no order issued. |
| 1/2/03 | Motion For Stay of Proceedings and For Enlargement of Time to Respond to Plaintiff's Complaint filed by Defendant. |
| 1/6/03 | Entry of Appearance by Letter filed by P. Andrew Hamilton, Esq. as co-co-counsel on behalf of Deft. Town of Orono. |
| 1/13/03 | Plaintiff's Opposition to Defendant's Motion to Stay Appeal and for Enlargement of Time to Respond to Plaintiff's Complaint.  Attachment attached. |
| 1/14/03 | Copy of Petition and Notice of Removal (to US Dist Court) of Defendant Town of Orono filed.  Exhibit A and Attachments attached. |
| 1/15/03 | CASE REMOVED TO U.S. DISTRICT COURT FOR THE DISTRICT OF MAINE. |